# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

FRANK MURPHY,

    **Plaintiff,**

    v.                                   **Case No. 19-CV-1232**

WISCONSIN CENTRAL LTD.,
a Delaware Corporation, d/b/a
CANADIAN NATIONAL RAILWAY COMPANY,

    **Defendant.**

## DECISION AND ORDER ON DEFENDANT'S MOTION
## FOR SUMMARY JUDGMENT

    Frank Murphy was working as an engineer for the railroad, Wisconsin Central, Ltd. ("the railroad"), when he sustained an injury on November 2, 2018. Murphy sues the railroad seeking damages for his injuries under the Federal Employers' Liability Act, 45 U.S.C. §§ 51 *et seq.* ("FELA"), the Locomotive Inspection Act ("LIA"), 49 U.S.C. § 20701, *et seq.*, and Federal Railway Administration Regulations. The railroad moves for summary judgment in its favor, dismissing Murphy's complaint. For the reasons further explained below, the railroad's motion for summary judgment is denied and the case will be scheduled for trial.

## SUMMARY JUDGMENT STANDARD

    Pursuant to Fed. R. Civ. P. 56(a), a party can seek summary judgment upon all or any part of a claim or defense asserted. The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *see also Anderson v. Liberty*

*Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986). "Material facts" are those under the applicable substantive law that "might affect the outcome of the suit." *See Anderson*, 477 U.S. at 248. The mere existence of some factual dispute does not defeat a summary judgment motion. A dispute over a "material fact" is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*

In evaluating a motion for summary judgment, the court must draw all inferences in a light most favorable to the nonmovant. *Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). However, when the nonmovant is the party with the ultimate burden of proof at trial, that party retains its burden of producing evidence which would support a reasonable jury verdict. *Celotex Corp.*, 477 U.S. at 324. Evidence relied upon must be of a type that would be admissible at trial. *See Gunville v. Walker*, 583 F.3d 979, 985 (7th Cir. 2009). To survive summary judgment, a party cannot rely on his pleadings and "must set forth specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 248. "In short, 'summary judgment is appropriate if, on the record as a whole, a rational trier of fact could not find for the non-moving party.'" *Durkin v. Equifax Check Services, Inc.*, 406 F.3d 410, 414 (7th Cir. 2005) (citing *Turner v. J.V.D.B. & Assoc., Inc.*, 330 F.3d 991, 994 (7th Cir. 2003)).

## FACTS

Frank Murphy was hired by the railroad as a locomotive engineer in 2006. (Def's Proposed Findings of Fact ("DPFOF") ¶ 2, Docket # 53 and Pl.'s Resp. to DPFOF ("Pl.'s Resp.") ¶ 2, Docket # 59.) In 2008, Murphy injured his left shoulder and although he cannot remember exactly how long he was on medical leave, it was for approximately 216

2

days that year. (*Id.* ¶ 3.) On February 19, 2010, Murphy applied for a disability annuity from the Railroad Retirement Board ("RRB") requesting a finding of permanent disability based on diagnoses of dysautonomia (a nervous disorder impacting involuntary body functions) and syncope (temporary loss of consciousness). (*Id.* ¶ 4.) Murphy was deemed to be totally disabled by the RRB on June 21, 2010. (*Id.* ¶ 5.)

Between January 2009 and December 2014, Murphy was off work due to numerous medical conditions, including his shoulder, dysautonomia, gallbladder surgery, and chronic pancreatitis. (*Id.* ¶ 7.) Murphy then worked from December 2014 until June 2015, when he went off work again for possible narcolepsy, which was eventually ruled out. (*Id.* ¶ 8.) Murphy was cleared to return to work in October 2016; however, he did not return due to continued episodes of syncope. (*Id.* ¶ 9.) Murphy was again cleared to return to work in April 2017, but went off work again for a year from August 2017 until August 2018 for continued issues with syncope. (*Id.* ¶ 10.) Murphy resumed working as a locomotive engineer in 2018. (*Id.* ¶ 11.)

On November 2, 2018, Murphy reported to work around 8:05 a.m. as an engineer for a unit oil train, designated U756, scheduled to travel from Fond du Lac, Wisconsin to Joliet, Illinois. (*Id.* ¶ 12.) The lead locomotive on U756 was locomotive CN 3120 (hereinafter "the lead locomotive"). (*Id.* ¶ 13.) In addition to the lead locomotive, there was a second, or trailing, locomotive at the head end of U756. (*Id.* ¶ 14.) A four-man crew operated U756 that day: Murphy (Engineer), Terrence Ford (Supervisor of Locomotive Engineers), Scott Langford (Locomotive Engineer Trainee), and Jason Solis (Conductor). (*Id.* ¶ 15.)

Prior to departing Fond du Lac, Murphy inspected both locomotives on U756 for safety defects, with no defects noted. (*Id.* ¶ 17.) No other member of the crew observed the presence of oil or grease on or near the lead locomotive. (*Id.* ¶ 18.) During the trip from Fond du Lac to Burlington, Murphy spent most of the trip riding in the cab of the trailing locomotive, while the other crew members rode in the cab of the lead locomotive. (*Id.* ¶ 21.) On several occasions during the trip from Fond du Lac to Burlington, U756 was diverted into sidings to permit the passage of opposing northbound trains. (*Id.* ¶ 22.) During these stops, the crew members would disembark the train and perform "roll-by inspections" of the opposing northbound trains. (*Id.* ¶ 23.) During these stops, no member of Murphy's crew reported seeing any oil or grease on the ground or anywhere near the locomotives on U756. (*Id.* ¶ 24.) Murphy, however, avers that he noticed oil covering the walkways and catwalks next to the engine compartment on the trailing locomotive as he maneuvered around the locomotive. (Declaration of Frank Murphy ("Murphy Decl.") ¶ 11, Docket # 59-6.) He states that the oil cover was sufficiently large that he could not avoid stepping in it if he was to do his work. (*Id.*) Murphy avers that after each roll-by inspection, he reboarded the leading locomotive and walked along the catwalk into the rear door of the trailing locomotive, noticing oil each time. (*Id.* ¶ 12.)

When U756 arrived in Burlington around 4:50 p.m., Ford and Langford disembarked the train to wait at the depot for a taxi ride back to Fond du Lac. (DPFOF and Pl.'s Resp. ¶¶ 25, 27.) Murphy and Solis remained onboard. (*Id.*) Murphy and Solis were to operate the train for two or three more miles from the Burlington depot into a track known as Nestle Siding where the train would be secured for the next train crew. (*Id.* ¶ 26.) U756 arrived at Nestle Siding around 5:00 p.m. (*Id.* ¶ 27.) Murphy and Solis then waited aboard

4

the train for approximately two and a half hours for a taxi cab to take them from Burlington back to Fond du Lac. (*Id.* ¶ 28.) When the cab arrived, Solis exited the train first, while Murphy followed several minutes later. (*Id.* ¶ 29.) Murphy avers that he collected his lunch box and grip and began walking down the steps in the nose of the lead locomotive to exit the locomotive when he lost his footing and slipped on the first step down. (Murphy Decl. ¶¶ 14–15.) Murphy states that his feet came out from under him and he landed on his back and neck and then slid down the stairs toward the lavatory at the bottom. (*Id.* ¶ 15.) Murphy does not know if he hit his head or lost consciousness due to how fast the slip and fall happened. (*Id.*) He claims his hip and "everything from [his] lower back up to [his] head hurt immediately after the fall." (*Id.*)

Murphy avers that he got up, exited the locomotive, and locked the locomotive up. (*Id.* ¶ 16.) He then walked over to Solis, who was on the phone, and told him that he fell on the steps and was in pain. (*Id.*) Murphy states Solis did not respond. (*Id.*) Solis, on the other hand, avers that Murphy did not say anything about falling or slipping on the stairs and did not appear to be in pain. (Declaration of Jason Solis ("Solis Decl.") ¶ 22, Docket # 53-4.) After the cab came, Solis avers that he and Murphy rode together about two hours back to Fond du Lac and Murphy said nothing about an injury, slipping, falling, or the presence of oil or any other substance on the locomotives during the entire cab ride. (*Id.* ¶ 23.)

Upon returning to Fond du Lac, Murphy states that he took off his boots by his truck and put them on a plastic bag in the back of the truck; however, he did not look at them after he took them off. (Murphy Decl. ¶ 16.) In the days following the fall, Murphy asserts that his pain became steadily worse. (*Id.* ¶ 17.) On November 7, 2018, he was instructed by the railroad's Risk Mitigation Officer, Lance Hunt, to go to Aurora Health Care in Fond du

5

Lac. (*Id.*) The treating nurse found no signs of neurological injuries. (DPFOF and Pl.'s Resp. ¶ 49.) On November 8, 2018, at the request of his then-attorney, Murphy checked his boots for oil and claims they were "covered" in oil. (*Id.* ¶ 50.) Murphy claims there was oil on the plastic bag in the truck on which he set his boots the day of the accident. (*Id.*)

Subsequent to the fall, Murphy returned to his home in Florida. (Declaration of Benjamin E. Alberty ("Alberty Decl.") ¶ 3, Ex. 1, Transcript of November 23, 2020 Deposition of Frank Murphy ("Nov. 23 Murphy Dep.") at 41, Docket # 59-2.) Murphy testified that approximately one week after returning home, his wife took him to the emergency room for an apparent stroke. (*Id.*) Murphy testified that he was told by the doctor that he had an apparent concussion and damage to the back of his brain. (*Id.*) Murphy's treating neurologist, Dr. James A. Scott, noted in a treatment note dated November 28, 2018 that Murphy:

> [C]ame home and [sic] 11/23 [911] was called because the paramedics evaluated him having a stroke. He went to Halifax, he had "clot buster" per pt and was admitted, MRI was done and it showed no evidence of a stroke, unfortunate events occurred at the hospital and the wife signed him out AMA 11/27/2018.

(Alberty Decl. ¶ 3, Ex. 7, Docket # 59-8 at 1–2.) Murphy alleges that he suffered numerous injuries from the November 2, 2018 fall, including: brain atrophy, a stroke, and problems with his back, neck, and hip, among others. (DPFOF and Pl.'s Resp. ¶ 53.)

## ANALYSIS

*1.    Legal Standards*

Murphy, a former railroad engineer, sues the railroad under FELA. Congress originally enacted the FELA in 1906 to create a federal remedy for railroad employees injured on the job by the negligence of their employers. *Kulavic v. Chicago & Illinois Midland*

6

*Ry. Co.*, 1 F.3d 507, 512 (7th Cir. 1993). This statute "serves to provide an injured worker with an expeditious recovery and also gives a railroad the incentive to maintain vigilance over the safety of its workers and, concomitantly, the conditions in which they must work." *Id.* An injured railroad employee can recover under the FELA as long as the employer's negligence "played any part, even the slightest, in producing the injury . . . for which damages are sought." *Rogers v. Missouri Pacific R.R.*, 352 U.S. 500, 506 (1957). The FELA is a broad remedial statute to be construed liberally in order to effectuate its purpose. *Kulavic*, 1 F.3d at 512. In addition to compensation for pain and suffering, the FELA allows damages for economic harms such as loss of past and future wages and impairment of earning capacity that result from the injury. *See, e.g.*, *Grunenthal v. Long Island R.R. Co.*, 393 U.S. 156, 160-62 (1968) (affirming award of damages which included past and future wages).

Railways are also subject to the LIA. The LIA "establishes safety standards for locomotives and their parts to be 'in proper condition and safe to operate without unnecessary danger of personal injury.'" *Rucker v. RDS Farm, Inc.*, No. 2:15-CV-272-TLS, 2017 WL 3720200, at *3 (N.D. Ind. Aug. 28, 2017) (quoting 49 U.S.C. § 20701(1)). The Federal Railroad Administration has also issued regulations concerning locomotive safety standards and inspections. *See* 49 C.F.R. §§ 200 *et seq.* A plaintiff injured due to a violation of the LIA may bring an action under FELA and a violation of the LIA is negligence *per se* under FELA. *Coffey v. Ne. Illinois Reg'l Commuter R. Corp. (METRA)*, 479 F.3d 472, 477 (7th Cir. 2007) ("And although the Act does not create a right to sue but merely establishes a safety standard, the failure to comply with that standard is negligence per se under the FELA.").

7

This means that if the plaintiff proves the statutory violation, he is relieved of the burden of proving negligence. *Id.* While he still must prove a causal relation between the violation and the injury for which he is suing, he gets the benefit of the "in whole or in part" language of the FELA, i.e., the "relaxed" causation standard. *See Lynch v. Ne. Reg'l Commuter R.R. Corp.*, 700 F.3d 906, 912 (7th Cir. 2012) (considering whether the violation was a cause, even in the slightest, of the plaintiff's injury); *see also Rucker*, 2017 WL 3720200, at *3 ("Once the LIA violation, and thus, the breach of a duty, has been established, a relaxed standard applies to the causation inquiry.").

> 2. *Application to this Case*

The railroad argues that Murphy's FELA claim fails for three principal reasons: (1) Murphy cannot establish that the railroad breached any duty of care owed to him; (2) Murphy cannot establish that his injury was foreseeable; and (3) Murphy cannot establish causation. (Def.'s Br. at 2, Docket # 54.) The railroad further argues that even if Murphy could establish these elements of his claim, Murphy puts forth no evidence that he suffered any future wage loss because any medical issues preventing him from working are unrelated to the alleged injury. (*Id.*) I will address each argument in turn.

> 2.1    Breach of Duty of Care

Again, FELA was enacted to provide a broad, federal tort remedy for railroad workers injured on the job and in so doing, abolished a number of traditional defenses to liability, including the fellow-servant rule, contributory negligence, and assumption of risk. *Williams v. Nat'l R.R. Passenger Corp.*, 161 F.3d 1059, 1061 (7th Cir. 1998). Even so, the FELA is not an insurance statute. *Id.* A FELA plaintiff must still offer evidence proving the common law elements of negligence, including duty, breach, foreseeability, and causation.

8

*Id.* at 1061–62. If, however, a FELA plaintiff can prove that the railroad violated the LIA, the violation is negligence *per se* under the FELA and the plaintiff then need only prove causation and damages to succeed on his FELA claim. *Coffey*, 479 F.3d at 477.

Again, in this case, Murphy was allegedly injured when he slipped on oil on the stairs of the locomotive while working for the railroad. The parties, however, rely on two different breach theories to support their respective positions, with neither party addressing the merits of the other's arguments. The railroad moves for summary judgment on the ground that Murphy produced no evidence that the railroad had either actual or constructive notice of the presence of oil or any slippery substance on the train's steps or anywhere else on the train. (Def.'s Br. at 15.) Whereas Murphy argues that he has presented proof of defective conditions on the train; thus, proof of foreseeability is unnecessary as the defect is negligence *per se* under FELA. (Pl.'s Br. in Opp. at 9–14, Docket # 58.)

As to the element of breach, I find questions of fact exist under either an ordinary negligence calculus or under the LIA's negligence *per se* analysis. Federal regulations require railroads to keep the "[f]loors of cabs, passageways, and compartment . . . free from oil, water, waste or any obstruction that creates a slipping, tripping or fire hazard. Floors shall be properly treated to provide secure footing." 49 C.F.R. § 229.119(c). The Seventh Circuit has found that a violation of § 229.119(c) imposes strict liability under the FELA. *McGinn v. Burlington N. R. Co.*, 102 F.3d 295, 300 (7th Cir. 1996). While the railroad does not address Murphy's LIA argument, given the plain language of the regulation, it would be difficult to argue that oil on the walking surfaces of the train did not violate § 229.119(c).

Thus, for Murphy to succeed on his FELA claim under an ordinary negligence analysis, he must show that the hazard was present and that the railroad either knew or

9

should have known about it. Whereas to succeed on his FELA claim under a negligence *per se* analysis, Murphy need only show that the oil was present. And the parties diametrically disagree on this issue. Murphy testified that on the day of the accident he observed oil covering the walkways and catwalks next to the engine compartment on the trailing locomotive. (Nov. 23 Murphy Dep. at 90; Murphy Decl. ¶ 11.) Murphy further testified that he had to walk through the oil on the catwalk because it covered the catwalk in such a way that he could not walk around it. (Nov. 23 Murphy Dep. at 94; Murphy Decl. ¶ 11.) Murphy further avers that after reboarding the lead locomotive after each roll-by inspection, he noticed oil each time as he walked along the catwalk into the rear door of the trailing locomotive. (Murphy Decl. ¶ 12.) Murphy further testified that after returning to Fond du Lac, he removed his shoes and placed them on a plastic bag in the back of his truck. (Nov. 23 Murphy Dep. at 99–101.) Murphy avers that after leaving the hospital on November 7, 2018, he inspected his boots and discovered oil on the soles. (Murphy Decl. ¶ 18.) He avers that the boots were brand new when he went to work on November 2 and they did not have oil on them prior to his shift. (*Id.*)

The railroad, in contrast, presents the declarations of Ford and Solis, who were both present as part of the crew on the day of the accident. Ford avers that he did not see oil or any other substance on the walking surfaces of the train or anywhere else when he boarded the train, nor did he see oil or any other substance anywhere on the second locomotive. (Declaration of Terrence Ford ("Ford Decl.") ¶ 7, Docket # 56.) Ford also avers that he could not recall seeing oil or other substances on the ground or anywhere on the locomotives when the crew stopped to perform the roll-by inspections. (*Id.* ¶ 12.) Ford states that on the day of the accident, he walked up and down the steps of the train at least five

times, looked at the walkways of the train, and likely walked back to the second locomotive where Murphy was located. (*Id.* ¶ 16.) Ford avers that he never saw oil or any other substance on the steps or in any other part of the locomotives. (*Id.*) He states that part of his job is to check for safety issues and had oil been present, he would have noticed it and reported it. (*Id.* ¶¶ 7, 17.)

Solis similarly avers that he did not observe any oil or other substances on the walking surfaces of the lead locomotive or anywhere on the locomotive when he boarded (Solis Decl. ¶ 6), nor could he recall seeing oil or other substances on the ground or on the lead locomotive when the crew stopped to perform the roll-by inspections (*id.* ¶ 11). Like Ford, Solis avers that he walked up and down the steps of the lead locomotive a number of times during the trip, and walked on the walkways including the walkway leading to the second locomotive where Murphy rode most of the trip. (*Id.* ¶ 21.) Solis states that he never saw oil or other substances on the steps or in any other part of the lead locomotive; rather, the steps and walkways were in good condition and provided secure footing. (*Id.*)

The Seventh Circuit has "long held that a plaintiff may defeat summary judgment with his or her own deposition." *Paz v. Wauconda Healthcare & Rehab. Ctr., LLC*, 464 F.3d 659, 664 (7th Cir. 2006). Murphy testified, based on his personal knowledge, about what he allegedly observed on the day of his accident. Solis and Ford, on the other hand, testified based on their personal knowledge of their observations. This is a quintessential dispute of fact that cannot be resolved on summary judgment. While the railroad tries to discredit Murphy by arguing that he submitted a "sham affidavit" in contradiction of his deposition testimony (Def.'s Reply Br. at 3–5, Docket # 61), I do not agree that Murphy's declaration submitted in opposition to summary judgment contradicts his deposition testimony to the

extent it is a "sham." The railroad argues that during his deposition, Murphy testified that he walked through oil only once at the Burlington Depot whereas now, he avers in his declaration that he walked through oil at each stop where the crew disembarked to perform roll-by inspections. (*Id.* at 4–5.) That is not entirely accurate. What Murphy testified to was that he could not recall whether he stepped in oil when he stopped to do the roll-by inspections and that he was "sure" he walked through oil on the catwalk "during that time" that he travelled from the trailing locomotive to the lead locomotive to operate the train into Nestle Siding. (Nov. 23 Murphy Dep. at 93–94.) In his declaration, however, Murphy is non-specific as to exactly when he stepped in the oil. (Murphy Decl. ¶ 11.) The railroad infers that if Murphy is saying that oil is covering the walkways and catwalks such that it was sufficiently large that he could not avoid stepping in it to do his work and that Murphy noticed oil each time he disembarked to perform a roll-by inspection, then he must be saying that he stepped in oil each time he performed a roll-by inspection. While this is a reasonable inference, one could also reasonably infer from both sworn testimonies that Murphy could not remember exactly when he actually stepped in the oil, though one of the times was likely while traveling to the lead locomotive to operate the train into Nestle Siding.

The railroad also urges me to follow a decision rendered by a Wisconsin state court in granting summary judgment to the railroad in a similar slip and fall case. In *Swayze v. Wisconsin Central, Ltd.*, Fond du Lac County Case No. 18-CV-39, the plaintiff testified that he slipped on some sort of substance, but admitted that he could not see because of insufficient lighting. (Docket # 52-12 at 11.) However, he later submitted an affidavit at summary judgment stating "unequivocally and without doubt oil and grease" were present

12

on the locomotive platform. (*Id.*) The court declined to credit the subsequent, contradictory affidavit and found that the plaintiff failed to prove breach. In so finding, the court stated:

> [L]ook, do we go to a jury and provide them with the facts in this case and expect them to discern the level of culpability, the obligation to provide a safe environment, when nobody knows what it was, nobody knows what it looked like, nobody knows how big it was, nobody knows the extent of how it was sitting on the deck? It's almost like a judicial election. It's a beauty contest. It will be, look, does the jury like the lawyer for the railroad or does the jury like the lawyer for the Plaintiff? But in terms of something they can hold their hands to, some testimony that they can hang on to, analyze and assess, there's nothing. Really the case of the phantom oil is what it is.

(*Id.* at 37.) The railroad argues that in this case, we similarly have nothing but "phantom oil." But *Swayze* is distinguishable. Without the clearly "sham" affidavit presented in that case, plaintiff testified that he slipped on something, but he could not see well enough to know what it was. In fact, the plaintiff testified that the conditions were dry and that he did not walk through anything. (*Id.* at 13.) Thus, plaintiff's assertion that he stepped in oil or grease was pure speculation. In this case, in contrast, Murphy testified that he saw oil on the walking surfaces and stepped through it, unable to avoid it. Again, while the railroad presents contrary evidence, that is the essence of a question of fact. As such, Murphy has presented sufficient evidence that a LIA violation existed, which would relieve him of proving foreseeability.

Even without the LIA violation, however, a fact question still exists as to foreseeability. A FELA plaintiff injured by a defective condition cannot recover damages without showing that the employer had actual or constructive notice of the condition. *Williams*, 161 F.3d at 1063. Murphy does not attempt to establish that the railroad had actual knowledge of the condition. In fact, Murphy testified that he could not remember if he reported the presence of oil to anyone else that day (Nov. 23 Murphy Dep. at 91) and

13

both Ford and Solis aver that Murphy said nothing about seeing oil (Ford Decl. ¶ 13, Solis Decl. ¶ 18).

As for constructive notice, however, the railroad has a duty to provide a safe workplace that contemplates reasonable inspections of equipment and appliances. *Williams*, 161 F.3d at 1063. To show constructive notice, Murphy has the burden of showing that the railroad could have discovered the oil and remedied the situation. *See id.* If the oil was as prevalent as Murphy alleges, then arguably the railroad could have discovered the oil and remedied the situation. Again, this comes down to the question of fact of what each party testifies that they saw. For these reasons, a question of fact remains as to whether the railroad breached its duty to Murphy.

### 2.2    Causation

My analysis, however, does not end there. Even if Murphy proves the railroad breached its duty, either through ordinary negligence or negligence *per se*, he must still show the breach caused his alleged injuries. As the court in *Williams* explained, however, the Supreme Court "relaxed" the negligence standard "by holding that the proof needed to get a case to a jury in a FELA case is merely whether employer negligence played any part, even the slightest, in producing the injury. *Williams*, 161 F.3d at 1061 (internal quotations and citations omitted). As such, "[a] plaintiff's burden in a FELA action is . . . significantly lighter than it would be in an ordinary negligence case." *Id.*

Murphy alleges that he suffered numerous injuries from the November 2, 2018 fall, including: brain atrophy, a stroke, and problems with his back, neck, and hip, among others. (DPFOF and Pl.'s Resp. ¶ 53.) The railroad argues that Murphy cannot prove that any of his alleged ailments were caused by the fall; rather, it contends that they were the result of

14

his significant pre-existing conditions. (Def.'s Br. at 19–27.) Murphy, in contrast, argues that his treating physician, Dr. Scott, and his retained experts, Dr. Neal Pollack and Dr. Joseph Wu, provide the necessary causal link (Pl.'s Br. at 14–19).

Murphy does not challenge the railroad's assertion that he must establish causation through expert testimony. (*See* Def.'s Br. at 20.) In *Myers v. Illinois Cent. R. Co.*, 629 F.3d 639 (7th Cir. 2010), the court stated that nothing in the FELA "alters the accepted fact that unless the connection between the negligence and the injury is a kind that would be obvious to laymen, expert testimony is required." *Id.* at 642. The court explained that when "there is no obvious origin to an injury and it has multiple potential etiologies, expert testimony is necessary to establish causation." *Id.* at 643 (internal quotation and citation omitted).

Murphy does not dispute that he has a lengthy history of various medical complaints dating back to 2006, including instances of dizziness and fainting. (DPFOF and Pl.'s Resp. ¶ 78.) Although Murphy alleges the fall caused damage to his back, neck, and hip, the most serious injury he alleges from the fall is the alleged stroke he sustained several weeks after the fall. The principal piece of evidence Murphy relies on in support of his causation argument is a handwritten note dated December 17, 2018, purportedly from his treating neurologist, Dr. Scott, written in support of a short-term disability claim made shortly after the fall. (Murphy Decl. ¶ 21.) In the note, Dr. Scott writes that Murphy "suffered a concussion from a fall that resulted in a minor stroke (CVA)." (*Id.*)

This note is insufficient to establish causation and is generally problematic for several reasons. First, the railroad argues that Murphy cannot rely on Dr. Scott as an expert because he failed to properly name Dr. Scott as an expert witness under Fed. R. Civ. P. 26 and failed to provide an expert report. (Def.'s Resp. to Pl.'s Resp. ¶ 76, Ex. M, Docket # 60-3.) Under

15

Rule 26, not all experts are required to provide a report. Rather, only those expert witnesses "retained or specially employed to provide expert testimony in the case or one whose duties as the party's employee regularly involve giving expert testimony" must provide a report under Rule 26. Rule 26(a)(2)(B). Thus, a treating physician such as Dr. Scott may not be required to provide an expert report if he will testify as to a causation determination rendered in the course of providing the plaintiff treatment. The Seventh Circuit has held, however, that "a treating physician who is offered to provide expert testimony as to the cause of the plaintiff's injury, but who did not make that determination in the course of providing treatment, should be deemed to be one 'retained or specially employed to provide expert testimony in the case,' and thus is required to submit an expert report in accordance with Rule 26(a)(2)." *Meyers v. Nat'l R.R. Passenger Corp. (Amtrak)*, 619 F.3d 729, 734–35 (7th Cir. 2010). It is entirely unclear under what circumstances Dr. Scott rendered this "opinion." This document is not a medical record, but is a statement written on a short-term disability form provided to the railroad. Thus, I am not convinced Dr. Scott is excepted from Rule 26's expert report requirement.

Even assuming, however, that Dr. Scott was not required to provide an expert report, this "opinion" is unauthenticated hearsay. Although the document purports to contain a statement and signature from Dr. Scott, Murphy does not submit an affidavit or otherwise provide testimony from Dr. Scott authenticating the document. Rather, Murphy's counsel appends the document to his own affidavit, stating "on information and belief" the document is a true and correct copy of a note Dr. Scott provided to Principal Financial on December 17, 2018. (Alberty Decl. ¶ 3, Ex. 8.) Even assuming, however, the document itself was properly authenticated, Dr. Scott's purported statement within the document, now

16

being used by Murphy for the truth of the matter asserted, is inadmissible hearsay. And a plaintiff cannot defeat a defendant's summary judgment motion relying on inadmissible evidence. *Carlisle v. Deere & Co.*, 576 F.3d 649, 655 (7th Cir. 2009).

Further, even giving Murphy the benefit of multiple assumptions and assuming, *arguendo*, Dr. Scott's statement was admissible, it falls far short of reliability under *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993). Under Fed. R. Evid. 702 and *Daubert*, "the district court must engage in a three-step analysis before admitting expert testimony. It must determine whether the witness is qualified; whether the expert's methodology is scientifically reliable; and whether the testimony will 'assist the trier of fact to understand the evidence or to determine a fact in issue.'" *Myers*, 629 F.3d at 644 (internal citation omitted). I cannot evaluate Dr. Scott's methodology for reaching his conclusion on causation, however, because his methodology is completely unknown. And "the courtroom is not the place for scientific guesswork, even of the inspired sort." *Rosen v. Ciba-Geigy Corp.*, 78 F.3d 316, 319 (7th Cir. 1996). Thus, Murphy cannot rely on this "opinion" by Dr. Scott to defeat the railroad's summary judgment motion as to causation.

Murphy also relies, however, on the opinions of his two retained experts, Dr. Pollack and Dr. Wu, to establish causation. In Dr. Pollack's report, he notes that although Murphy has previously been diagnosed with peripheral neuropathies, dysautonomia, abnormal movements, syncopal episodes, spinal arthritis, and cardiovascular disease, he was medically cleared to work without restriction. (Alberty Decl. ¶ 3, Ex. 10, Exhibit Report of Dr. Pollack at 6, Docket # 59-11.) Dr. Pollack states that when Murphy slipped on the locomotive steps on November 2, 2018, he "probably sustain[ed] spinal soft tissue injuries" and he "possibly" sustained a concussion. (*Id.*) Dr. Pollack notes that Murphy has

deteriorated neurologically since the accident and the "trauma" sustained from the accident "is in part a contributing causative factor in his present condition." (*Id.*)

The railroad challenges Dr. Pollack's opinion as not passing muster under *Daubert*. Murphy faults the railroad for "attempting to slide a *Daubert* motion into a summary judgment motion" by challenging Dr. Pollack's opinion. (Pl.'s Br. at 15–16.) But given Murphy needs expert testimony to establish causation and cannot rely on inadmissible evidence to defeat summary judgment, it is proper to examine whether Dr. Pollack's opinion is sufficient under *Daubert*.

When questioned about the conclusions stated in his expert report, Dr. Pollack testified that he was "not convinced" that Murphy actually had a stroke post November 2018 (Alberty Decl. ¶ 3, Ex. 12, Deposition of Dr. Neal Pollack ("Pollack Dep.") at 33–34, Docket # 59-13) and could not opine to a reasonable degree of medical certainty that Murphy sustained a concussion from the fall (*id.* at 37). Dr. Pollack was asked whether he had an opinion, to a reasonable degree of medical certainty, whether Murphy's fall in 2018 caused his neurological deterioration. Dr. Pollack testified: "I think that the fall on 11/2/18 primarily caused him neck, soft tissue injuries, and I think that he definitely has deteriorated since that time neurologically. Did it specifically cause this, no. I think that there's a substantial factor involved with increased pain and stress-related responses that have influenced his deterioration also." (*Id.* at 45.)

As with Dr. Scott, it is entirely unclear what methodology Dr. Pollack used to reach his conclusion. The court of appeals' decision in *Myers* is instructive on this issue. In *Myers*, the plaintiff alleged that the railroad's negligence caused cumulative trauma injuries to his knee, elbow, back, and neck. 629 F.3d at 641. The plaintiff's treating physicians opined that

18

the railroad's working conditions caused plaintiff's ailments. *Id.* at 644. When the railroad challenged the methodology of the doctors' causation opinions under *Daubert*, plaintiff argued that the physicians used a "differential diagnosis" to establish what caused his ailments. *Id.* The court explained that "differential diagnosis" is an accepted and valid methodology for an expert to render an opinion about the identity of a specific ailment, but that was not what the physicians were trying to do. *Id.* Rather, the court found that what the experts were trying to perform was a "differential etiology." *Id.* The court explains:

> Etiology is the study of causation. And in a differential etiology, the doctor rules in all the potential causes of a patient's ailment and then by systematically ruling out causes that would not apply to the patient, the physician arrives at what is the likely cause of the ailment. There is nothing controversial about that methodology. The question of whether it is reliable under *Daubert* is made on a case-by-case basis, focused on which potential causes should be "ruled in" and which should be "ruled out."

*Id.* (internal quotations and citations omitted). The court found, however, that while differential etiology is an acceptable methodology, there was nothing in the record suggesting that the physicians actually performed a differential etiology, "or if it was done that it could be considered reliable, because they did not rule in any causes of [plaintiff's] ailment, nor did they rule out anything. They simply opined that it was the Railroad's working conditions that caused [plaintiff's] ailment." *Id.*

Similarly, Dr. Pollack acknowledges in his report that Murphy's medical history includes "some questionable cervical disc disease" and "some mildly increased insertion activity in the left C5-6 region associated with neck pain." (Pollack Expert Report, Docket # 59-11 at 3.) Murphy's medical history includes complaints of "spells, paresthesia, fatigue, dysphasia, cognitive concerns, headaches, blurred vision, and disequilibrium." (*Id.*) Given the extent of Murphy's pre-existing conditions, Dr. Pollack does not explain how he reached

19

his conclusion that it was the November 2, 2018 fall, rather than a myriad of other potential sources, that caused his now complained of ailments of brain atrophy, stroke, and problems with his back, neck, and hip. Beyond asserting that Murphy had been cleared to work prior to the November 2, 2018 fall, Dr. Pollack does not appear to engage in a differential etiology. For these reasons, Murphy cannot rely on Dr. Pollack's expert report to defeat summary judgment.

Murphy's final expert, however, Dr. Wu, does perform a differential etiology analysis. Although Dr. Wu calls it "differential diagnosis," it is clear that what he is actually doing is ruling out potential causes of Murphy's ailments, not opining about the identity of the ailments. (Alberty Decl. ¶ 3, Ex. 9, Docket # 59-10.) Dr. Wu explains that in determining the cause of the abnormalities shown on various scans, he ruled out various other causes such as schizophrenia, abuse and neglect, stroke, and tumor, among others. (*Id.* at 17–18.) Dr. Wu then opines "to a reasonable degree of medical probability" that Murphy's ailments were caused by brain injury from the November 2, 2018 fall. (*Id.* at 18.) Thus, Dr. Wu's expert opinion does not suffer from the same deficiencies as Dr. Pollack's. As such, with at least one expert providing an opinion on causation, Murphy puts forth sufficient evidence to send the question to the jury under the relaxed causation standard of FELA.[1]

---

[1] In its reply brief, the railroad also argues that Dr. Wu's expert report was untimely disclosed (i.e., was not disclosed until *after* the railroad filed its summary judgment motion) and thus should also be stricken on that basis. (Def.'s Reply Br. at 19–21.) The railroad simultaneously filed a separate motion to exclude Dr. Wu's report on this same untimeliness ground. The railroad subsequently withdrew its motion to exclude Dr. Wu's report (Docket # 66); however, the argument remains in the reply brief. It is unclear whether the railroad intended to also withdraw the argument from the reply brief or if it was withdrawing the separate filing because it was redundant (or for some other unknown reason). Either way, the parties dispute whether the report was untimely produced. While the railroad contends it received the report on January 3, 2022 with Murphy's summary judgment response (Supplemental Declaration of Peter C. McLeod, Docket # 65), Murphy contends the report was produced on August 13, 2021 along with the expert disclosures (Alberty

2.3     Wage Loss Claims

The railroad argues that while Murphy asserts claims for both past and future lost earnings, he has failed to provide sufficient evidence that the alleged injury caused his lost earnings. (Def.'s Br. at 27.) The railroad argues that the evidence shows that Murphy was unable to work as an engineer regardless of the November 2, 2018 injury. (*Id.* at 28.) It argues that "[t]he simple fact is [Murphy] should have never been hired as a locomotive engineer to begin with. Prior to this incident, [Murphy] was determined to be permanently disabled and received a full disability award from the RRB for these conditions." (*Id.*) But the evidence shows that Murphy *was* medically cleared to work as an engineer *despite* these pre-existing conditions and in fact was working up until the alleged injury. Whether the railroad should have hired Murphy to begin with given his medical history is irrelevant. There is no indication Murphy was concealing his medical history from the railroad, and the railroad chose to medically clear him anyway.

In its reply, the railroad pivots its focus back to causation, arguing that Murphy failed to provide a differential etiology performed by his medical experts, thus he cannot prove his alleged ailments were caused by the railroad's alleged negligence. (Def.'s Reply Br. at 26.) But for the reasons explained above, I find Dr. Wu provides said differential etiology.

Finally, the railroad argues that Murphy was never really interested in returning to work anyway, stating that Murphy's lawsuit "has less to do with terrible injuries sustained while working for the railroad and more to do with his scheme to obtain a quick settlement and early retirement at the railroad's expense" that should give this Court "pause." (*Id.* at

Decl. ¶ 3). Thus, on this record, I cannot determine whether Dr. Wu's report was untimely produced and thus will deny this portion of the railroad's summary judgment motion.

27.) But it is not appropriate for the Court on summary judgment to assess Murphy's credibility. If the railroad has evidence to impugn Murphy's credibility, it is best saved for the jury at trial. Because disputes of material fact exist to be resolved at trial, summary judgment is inappropriate at this juncture.

## CONCLUSION

Murphy sustained an injury while working for the railroad on November 2, 2018. Murphy presents evidence that he observed oil on the train, in violation of the LIA, while the railroad presents evidence that no oil was present. While the railroad contends that Murphy cannot show that his alleged injuries were caused by the November 2 fall, Murphy presents admissible evidence from Dr. Joseph Wu opining the requisite causation. Because there are disputes of material fact to be resolved at trial, the railroad's motion for summary judgment is denied.

## ORDER

**NOW, THEREFORE, IT IS ORDERED** that defendant's motion for summary judgment (Docket # 52) is **DENIED**. The clerk's office will contact the parties regarding scheduling this matter for trial. Prior to the status conference, the parties are ordered to confer regarding potential trial dates.

Dated at Milwaukee, Wisconsin this 20th day of April, 2022.

BY THE COURT:

_____
NANCY JOSEPH
United States Magistrate Judge

22